**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **ROSEMARY NIXON**, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. Action No.: 15-2395 (FLW) |
| | : | |
| **CAROLYN W. COLVIN**, acting | : | **OPINION** |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**WOLFSON, United States District Judge:**

      Rosemary Nixon ("Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin (the "Commissioner"), denying Plaintiff disability insurance benefits and supplemental security income under Title II of the Social Security Act (the "Act"). Plaintiff contends that in rendering his decision, the Administrative Law Judge (the "ALJ") (1) failed to take into account all of her impairments in determining her residual functional capacity ("RFC"), (2) failed to properly evaluate and weigh the medical evidence of record, and (3) failed to properly address a conflict between the testimony of the vocational expert and the Dictionary of Occupational Titles (the "DOT").

      After reviewing the Administrative Record, the Court finds that the ALJ did not provide a clear and satisfactory explanation of his determination of Plaintiff's RFC, and thus, his decision is not based on substantial evidence. Accordingly, this case is remanded for further proceedings before the ALJ, consistent with this Opinion.

1

I.     **Factual Background and Procedural History**

This matter arises from Plaintiff's disability application, filed on August 9, 2011, alleging disability beginning April 5, 2008, due to high blood pressure, diabetes mellitus, and allergies. Administrative Record ("A.R.") 177-89, 205. Plaintiff later amended her date of disability onset to March 3, 2010. A.R. 29. Plaintiff's claims were first denied on January 24, 2012. A.R. 109-20. Reconsideration of her application was denied on June 6, 2012. A.R. 127-32. Thereafter, on August 6, 2012, Plaintiff filed a request for a hearing before an Administrative Law Judge. A.R. 135-39. On August 21, 2013, Plaintiff, represented by counsel, Rita J. Bonner, Esq., appeared and testified at a hearing before ALJ Kenneth Bossong. A.R. 25-66. On December 4, 2013, the ALJ determined that Plaintiff was not disabled. A.R. 12-24. Plaintiff requested a review by the Appeals Council, and on February 8, 2015, the Appeals Council denied Plaintiff's request. A.R. 6-10. This appeal followed.

Plaintiff was born on August 25, 1960, and was 49 years old on the alleged onset date of her disability, March 3, 2010. A.R. 31. Plaintiff's alleged disability results from depression, lower back pain with sciatica, leg pain, diabetes with diabetic neuropathy, and headaches with recurrent ear infections A.R. 30. Plaintiff testified at the hearing before the ALJ that she could not work due to pain in her feet, left side, fingertips, head, and ears, as well as muscle spasms, drowsiness caused by her medication, swollen and tingling feet, shortness of breath, fatigue, forgetfulness, and incontinence. A.R. 39-45. Plaintiff takes medication for her foot pain, muscle spasms, high blood pressure, diabetes, and incontinence. A.R. 41. Plaintiff is on a special doctor-prescribed diet, due to her diabetes, to help modulate her blood sugar. A.R. 42. Plaintiff also testified that she suffers from incontinence resulting from a hysterectomy, and has episodes of incontinence approximately three times per day. A.R. 44-45.

### a. Review of the Medical Evidence[1]

#### i. Marcella Frank, D.O.– Treating Physician

On July 5, 2011, Plaintiff underwent a polysomnogram to evaluate the quality of her sleep. A.R. 348-349. After observing Plaintiff while sleeping, Dr. Marcella Frank diagnosed Plaintiff with snoring. A.R. 349. For better sleep, Dr. Frank recommended that Plaintiff avoid sleeping in a supine position and that she lose weight. A.R. 349.

#### ii. Olasinbo Olukoya, M.D. – Treating Physician

Plaintiff's medical records indicate that on October 24, 2011 she underwent a successful hysterectomy to treat a symptomatic fibroid uterus, dysmenorrhea, and menorrhagia. A.R. 357. Plaintiff was discharged from the hospital three days after her surgery without incident. A.R. 357.

#### iii. Francky Merlin, M.D. – Examining Physician

On January 11, 2012, Plaintiff attended a consultative exam with Dr. Francky Merlin to assess the scope of her impairments. A.R. 367. Dr. Merlin noted that Plaintiff has a history of high blood pressure, diabetes, and depression. A.R. 367. Plaintiff reported to Dr. Merlin that she had previously undergone a hysterectomy and surgery on her right knee. A.R. 367. Plaintiff claimed that she had stopped using recreational drugs 20 years ago, stopped smoking five years ago, and that she no longer drank. A.R. 367.

Dr. Merlin performed a physical examination of Plaintiff and found that Plaintiff had no difficulty getting up from a sitting position or getting on and off the examining table; she did not have impaired grasping strength of manipulative functions; she could squat and walk on her heels

---

[1] The Court notes that numerous pages of the medical record consist of illegible handwritten and poorly photocopied notes.

and toes; she did not have impaired range of motion; and her station and gait were normal. A.R. 368. Dr. Merlin measured Plaintiff's blood pressure at 140/80. A.R. 368. Dr. Merlin also noted that Plaintiff's feet were cold with dorsalis pedis pulses that were not palpable. A.R. 368. Neurologically, Dr. Merlin observed that Plaintiff was alert, conscious, and oriented. Ar. 368. Based on his physical examination, Dr. Merlin diagnosed Plaintiff with hypertension and diabetes mellitus. A.R. 369. Additionally, Dr. Merlin concluded that Plaintiff "is able to sit, stand, walk, crouch, carry, hear and speak." A.R. 369.

### iv.    P.N. Aruna, M.D. – Treating Physician

On January 17, 2012, Plaintiff sought treatment from Dr. P.N. Aruna for ear pain. A.R. 452. Plaintiff reported experiencing "constant ear infection, . . . swelling of the ears, [and the feeling] like there is something running out of her ear." A.R. 452. Plaintiff also claimed that her hearing at the time was "fair." A.R. 452. Dr. Aruna examined Plaintiff and diagnosed her with a perforation of the right-side tympanic membrane and recurrent otitis media. A.R. 452. Dr. Aruna prescribed a ten day treatment course of amoxicillin, seven days of treatment with ciprodex, and two weeks of treatment with Zyrtec. A.R. 452. Dr. Aruna also instructed Plaintiff to return for a follow-up examine. A.R. 452.

### v.    Bradd Millian, M.D. – Treating Physician

On March 16, 2012, Dr. Bradd Millian performed an MRI exam of Plaintiff's brain to investigate the source of her headaches. A.R. 399. Dr. Millian found no abnormalities. A.R. 399.

### vi.    Gary Karlin, M.D. – Treating Physician

On April 10, 2012, Plaintiff sought treatment from Dr. Gary Karlin for incontinence. A.R. 450. Dr. Karlin opined that Plaintiff's incontinence resulted from her prior hysterectomy and prescribed medication as treatment. A.R. 449-50.

### vii.    P.N. Aruna, M.D. – Treating Physician

On April 24, 2012, Plaintiff attended a follow-up exam with Dr. P.N. Aruna for her right-side tympanic membrane perforation. A.R. 455. Plaintiff claimed that she was still experiencing ear pain and congestion. A.R. 455. Dr. Aruna examined Plaintiff and found that she still had right-side tympanic membrane perforation, and newly diagnosed her with chronic sinusitis. A.R. 457. Dr. Aruna prescribed a CT scan of Plaintiff's mastoid, and suggested that mastoid surgery might be necessary pending the results of the CT scan. A.R. 457.

### viii.    Kim Arrington, Psy.D. – Examining Physician

Plaintiff attended a consultative exam with Dr. Kim Arrington on May 3, 2012 to assess the extent of her mental impairments. A.R. 458. Dr. Arrington noted that Plaintiff has a history of high blood pressure, diabetes, iron deficiency, and had undergone a hysterectomy in October 2011. A.R. 458. Plaintiff informed Dr. Arrington that she had been taken to a psychiatrist as a child because her step-parents thought "something was wrong with me." A.R. 458. Additionally, Dr. Arrington noted that Plaintiff was currently taking a daily prescription of 75 mg of amitriptyline, an anti-depressant. A.R. 458.

Plaintiff reported to Dr. Arrington that she suffered from a number of mood-related symptoms, including: poor sleep; dysphoric moods; crying spells; fatigue; difficulty concentrating; isolating herself from others; episodes of increased agitation, which induce arguments with others and thoughts of hurting others; excessive worry; nightmares; flashbacks to unpleasant experiences; and panic attacks with heart palpitations and sweating. A.R. 458-59. Additionally, Plaintiff claimed to be experiencing cognitive symptomatology, such as short- and long-term memory deficits and becoming easily disoriented. A.R. 459. However, Plaintiff also reported that her

5

appetite was fair. A.R. 458. Plaintiff informed Dr. Arrington that she had a history of marijuana and cocaine use, but had not used intravenous drugs in 22 years. A.R. 459.

Based on an interview and examination of Plaintiff, Dr. Arrington diagnosed Plaintiff with cyclothymic disorder, rule-out bipolar 2 disorder, and rule-out post-traumatic stress disorder. A.R. 460. Dr. Arrington assigned Plaintiff a global assessment of functioning ("GAF") score of 50, which indicates serious symptoms or serious impairment in social, occupational, or school functioning. A.R. 460. She found that Plaintiff's mood fluctuations and anxiety may significantly interfere with her ability to function on a daily basis. A.R. 460. Ultimately, Dr. Arrington concluded that Plaintiff is able to follow and understand simple directions and instructions, perform simple tasks independently, but has difficulty maintaining attention and concentration, as well as learning new tasks and performing complex tasks independently. A.R. 460. Dr. Arrington opined that Plaintiff would be able to maintain a regular schedule with support and structure. A.R. 460. Additionally, Dr. Arrington stated that Plaintiff needed support managing her finances, due to her difficulties with attention, concentration, and memory. A.R. 461.

### b.   Review of Disability Determinations

### i.   Martin Sheehy, M.D. – Disability Determination

On January 24, 2012, state agency medical consultant, Dr. Martin Sheehy, reviewed the evidence of disability submitted by Plaintiff and assessed Plaintiff's level of impairment. A.R. 67-74. Dr. Sheehy determined that Plaintiff suffers from mild obesity, diabetes mellitus, essential hypertension, and allergies. A.R. 67. Dr. Sheehy did not find that Plaintiff suffers from any significant psychological problems. A.R. 71. He concluded that Plaintiff's impairments do not significantly limit her physical or mental ability. A.R. 73. Accordingly, Dr. Sheehy determined that Plaintiff was not disabled. A.R. 74.

6

###### ii.    Jose Acuna, M.D. – Disability Determination

On May 21, 2012, state agency medical consultant, Dr. Jose Acuna, reviewed the evidence of disability submitted by Plaintiff and reassessed her level of impairment. A.R. 83-93. Dr. Acuna determined that Plaintiff suffers from mild obesity, diabetes mellitus, essential hypertension, and affective disorders. A.R. 87-88. Dr. Acuna observed that Plaintiff's blood pressure and blood glucose are controlled with medication, and that her physical impairments do not significantly limit her ability to perform work. A.R. 87. Dr. Acuna further observed that Plaintiff's mental impairments do not equal an affective disorder disability under Section 12.04 of 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"), because her restriction of activities of daily living is mild, her difficulties in maintaining social functioning are moderate, her difficulties in maintaining concentration, persistence or pace are moderate, and she has no history of repeated episodes of decompensation, each of extended duration. A.R. 88. Additionally, Dr. Acuna found Plaintiff's mental impairments did not equal a disability under Section 12.04, because she had no medically documented history of a chronic affective disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. A.R. 88.

Based on his assessment of her mental RFC, Dr. Acuna determined that Plaintiff is moderately limited in her ability to understand, remember, and carry out detailed instructions;

moderately limited in her attention, concentration, and pace; moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them; moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; moderately limited in her ability to respond appropriately to changes in the work setting; and moderately limited in her ability to travel in unfamiliar places or use public transportation. A.R. 89-91. Dr. Acuna reasoned that because Plaintiff's RFC limited her to unskilled work, she could not perform her past work as a clerk, which had a specific vocational preparation ("SVP") of 3. A.R. 92. Nonetheless, Dr. Acuna found that Plaintiff was not disabled because she could perform unskilled heavy work. A.R. 92-93.

### c. Review of the Testimonial Evidence

#### i. Plaintiff's Testimony

At the hearing before the ALJ on August 21, 2013, Plaintiff amended her disability onset date from April 5, 2008, the date she was laid off from her job at American Color Graphics, to March 3, 2010, the first time she was treated for her diabetes. A.R. 29.

At the hearing, Plaintiff testified that she has an 11th grade education and never received any specialized training for work. A.R. 33-34. Plaintiff explained that she can read and write as well as perform basic math, but that she relies on her daughter to help manage her money because it is difficult for her to count. A.R. 34-35. Plaintiff stated that between 2006 and 2008 she worked for American Color Graphics as a machine operator, and between 1986 and 2006 she worked for the Trenton Times as a machine operator/clerk. A.R. 33, 35-36. Plaintiff explained that at both of these jobs, her duties involved feeding skids of paper into a printing machine, unloading the bundles produced by the machine, and confirming that the bundles were being produced correctly.

8

A.R. 59. According to Plaintiff, her job at American Color Graphics required her to lift packets of papers, as heavy as 15 pounds each. A.R. 35. Additionally, she stated that while performing this work she was often on her feet, sometimes for up to 12 hours at a time. A.R. 35. Regarding her job at the Trenton Times, Plaintiff testified that she was required to lift items up to 20 pounds in weight and was often on her feet. A.R. 36.

Plaintiff stated that in April 2008, she was laid off from her job with American Color Graphics. A.R. 36. According to Plaintiff, for two years after she lost her job, she received unemployment benefits and actively sought new work in warehouses, but was not offered a job. A.R. 38. Plaintiff explained that if she had been offered a job at that time, she would have accepted it, but that if she was offered a job now, she would not be able to work because of her alleged disability. A.R. 38-39.

Plaintiff testified that she is currently unable to work because she "[has] a lot of pain and [her] medicine makes [her] tired and drowsy, and [her] feet swell up." A.R. 39. Plaintiff claimed that she experiences pain in many areas of her body, including her feet, her left side, her fingertips, her head, and her ears. A.R. 39. She explained that she had surgery on her right foot to remove a "mass," and subsequently has suffered swelling, pain, and tingling in that foot. A.R. 39. Plaintiff described how her fingertips in her left hand turn blue, are painful, and feel numb. A.R. 40. According to Plaintiff, when this occurs, she has difficulty using her hands and they are painful to the touch. A.R. 41. Plaintiff testified that when she experiences pain in her ears, it sometimes prevents her from being able to hear. A.R. 41. Plaintiff stated that the pain in her left side is caused by muscle spasms. A.R. 42-43. At one point during her testimony, Plaintiff claimed that although she takes medication for her pain and muscle spasms, it does not help relieve her pain. A.R. 43. Later, Plaintiff stated that her pain medication helps lessen the pain a little bit. A.R. 49. Plaintiff

further stated that this medication causes her to become drowsy. A.R. 39, 41. Plaintiff said that her doctor recommended physical therapy to treat her pain and spasms, and that she planned to undergo such treatment in the future. A.R. 55.

Plaintiff further testified that she takes medication to control her diabetes. A.R. 41. She claimed to adhere to a restricted diet, prescribed by her doctor for diabetes, to help modulate her blood sugar. A.R. 42. However, despite this treatment, Plaintiff stated that her blood sugar usually measures in the high 200s. A.R. 42. Similarly, Plaintiff said that she takes medication for her high blood pressure, but despite this treatment, her blood pressure is still too high. A.R. 43-44.

Plaintiff testified that in October 2011, she had a partial hysterectomy, and that due to this surgery she now suffers from incontinence. A.R. 44, 54. Although Plaintiff takes medication to treat her incontinence, she testified that she still experiences episodes of incontinence approximately three times per day. A.R. 44-45. Plaintiff explained that her incontinence occurs not because she needs to use the bathroom and is unable to make it in time, but rather because she is not aware that she needs to relieve herself. A.R. 45.

Plaintiff stated that she currently lives with her 29 year-old daughter and 13 year-old grandson. A.R. 32. Her daily activities, according to her testimony, include "try[ing] to pick up around the house," sitting, napping, and minor chores like washing dishes. A.R. 45-46. Plaintiff testified that she no longer cooks for herself. A.R. 57. Plaintiff claimed that she cannot lift her granddaughter, who is 19 pounds, and is unsure if she could lift a 5-pound bag of flour. A.R. 50. Plaintiff stated that she cannot lift her arms above her head long enough to put rollers in her hair, and it is difficult to use her hands for long periods of time. A.R. 50-51. According to Plaintiff, she frequently sews clothing and reads books for pleasure. A.R. 55-56. Plaintiff stated that she can only follow a television program for one hour before losing attention. A.R. 49.

10

Finally, Plaintiff testified that she has a driver's license and can drive, but does not drive alone because she forgets where she parked her car or how to get back home. A.R. 46-47. Plaintiff stated that she leaves her home approximately every other day, to run errands with her daughter. A.R. 49. Plaintiff testified that on these trips with her daughter, she can only walk around a store for up to half an hour before tiring. A.R. 49-50.

### i. Lois Salozy – Vocational Expert's Testimony

At the hearing before the ALJ on August 21, 2013, the vocational expert, Lois Salozy, testified that, based on Plaintiff's testimony and a review of Plaintiff's disability report, Plaintiff previously worked as an inserting machine operator. A.R. 60. Mr. Salozy further testified that even though this job is typically performed at medium exertion, Plaintiff performed this job at light exertion. A.R. 60. Mr. Salozy stated that this job is unskilled and has a SVP level of 2, meaning up to one month of training is required to perform the job. A.R. 60. Based on the same evidence, Mr. Salozy also testified that Plaintiff had also previously performed the job of a mail clerk. A.R. 60. He explained that she performed this job as unskilled and light exertion, with an SVP level of 2.

The ALJ questioned Mr. Salozy as to whether a hypothetical individual who had no exertional limitations, but was only able to understand, remember, and carry out simple instructions, was limited to occasional interaction with coworkers, and could only abide infrequent and gradually introduced change in the workplace, would be capable of performing Plaintiff's past work. A.R. 61. Mr. Salozy opined that such an individual would be able to perform both of Plaintiff's previous jobs. A.R. 61. If the hypothetical individual's abilities were further restricted to no more than occasional interactions with supervisors, Mr. Salozy opined that she would still be able to perform both of Plaintiff's past jobs. A.R. 61. However, Mr. Salozy testified that if the

11

same hypothetical individual was also exertionally limited to light exertion, with all postural limitations (*e.g.* climbing stairs, stooping, kneeling, etc.) being occasional, she would not be able to perform work as an inserting machine operator, but would still be able to work as a mail clerk. A.R. 61-62. Finally, Mr. Salozy opined that if the hypothetical individual was also required to take a 10 minute break every hour, she would not be able to perform either of Plaintiff's past jobs, or any work available in the national economy. A.R. 62.

### d. The ALJ's Findings

In a decision dated December 4, 2013, the ALJ determined that Plaintiff met the insured status requirements of the Act, and would continue to meet them through December 31, 2013. A.R. 15. After reviewing the record and applying the relevant law, the ALJ found that Plaintiff was not disabled, within the meaning of the Act, from April 5, 2008 through the date of the ALJ's decision. A.R. 15. In reaching this conclusion, the ALJ applied the standard five-step evaluation process to determine if Plaintiff satisfied her burden of establishing disability.[2]

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 3, 2010, the amended alleged disability onset date. A.R. 17.

At step two, the ALJ determined that Plaintiff has the following severe impairments: cyclothymic disorder, rule-out diagnosis for bipolar II disorder, rule-out diagnosis for post-traumatic stress disorder, diabetes mellitus, obesity, incontinence, and hypertension. A.R. 17.

At step three, the ALJ determined that Plaintiff does not have an impairment, or combination of impairments, that meets or medically equals the severity of any of the impairments included in the Impairment List. A.R. 18. This determination was based on the fact that "no treating

---

[2] *See infra* Part III.

or examining physician . . . mentioned findings equivalent in severity to the criteria of any listed impairments" and that the state agency medical consultants opined that Plaintiff's impairments did not equal a listing. A.R. 18. Specifically, the ALJ stated that Plaintiff's impairments, taken together, do not constitute a respiratory disorder under Sections 3.00, *et seq*, of the Impairment List, an endocrine disorder under Sections 9.00, *et seq*, of the Impairment List, or a mental disorder under Sections 12.04 or 12.06, of the Impairment List. A.R. 18.

The ALJ further explained that Plaintiff's impairments do not equal an affective disorder, under Section 12.04, or an anxiety related disorder, under Section 12.06, because Plaintiff does not have two of the restrictions listed in Section 12.04(B) and Section 12.06(B) – (1) marked restriction in two of the activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. A.R 18. The ALJ found that although Plaintiff has "mild difficulties in maintaining activities of daily living," these difficulties did not reach the level of marked difficulties. A.R. 18. In making this finding, the ALJ cited to Plaintiff's testimony that she was able to sew clothes, and had sewed a dress for her granddaughter, which took her two days to complete. A.R. 18. Additionally, the ALJ determined that because Plaintiff has a good relationship with her daughter, who helps her with cooking and cleaning, Plaintiff has moderate, but not marked, difficulties in maintaining social functioning. A.R. 18. With regard to Plaintiff's difficulties maintaining concentration, persistence, and pace, the ALJ observed that Plaintiff takes medication, which makes her tired and drowsy; she forgets appointments; she loses her glasses 3-4 times per day; her recent and remote memory are impaired by her depression; and she is unable to do multiplication or division. A.R. 18. Based on these impairments, the ALJ determined that Plaintiff's difficulties maintaining concentration,

persistence, and pace are moderate, but not marked. A.R. 18. The ALJ found that Plaintiff had experienced no episodes of decompensation. A.R. 19. Therefore, the ALJ concluded that Plaintiff's impairments do not meet the requirements of an affective disorder under Section 12.04. A.R. 19.

Additionally, the ALJ found that Plaintiff's impairments do not equal an affective disorder, under Section 12.04, because Plaintiff does not have "a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." A.R. 19. Finally, the ALJ found that Plaintiff's impairments also do not equal an anxiety disorder, under Section 12.06, because Plaintiff does not have a complete inability to function outside her home. A.R. 19.

At step four, the ALJ found that Plaintiff has the RFC to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), but that she can only occasionally climb stairs; balance; stoop; kneel; crouch; climb ladders; or crawl; and that she can only frequently finger. A.R. 19. The ALJ determined that Plaintiff's RFC is also limited to understanding, remembering, and carrying out simple instructions in a workplace where contact with a supervisor, coworker, and the public is occasional, and where changes in the workplace are infrequent and gradually introduced. A.R. 19. In determining Plaintiff's RFC, the ALJ considered "all symptoms and the extent to which

these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the opinion evidence on the record.

The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements, concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." A.R. 21. The ALJ noted that Plaintiff left her job in 2008 only because she was laid off. A.R. 20. And although there are many pages of Plaintiff's medical records, cataloging physical testing and treatment that she received, these records do not include "significant findings," A.R. 20. Additionally, the ALJ observed that there were no x-ray reports or magnetic resonance imaging reports included in Plaintiff's medical records. A.R. 20. The ALJ found that Plaintiff's glucose and hypertension numbers, although mildly elevated at times, are reasonably controlled with her medications. A.R. 20. And, the ALJ observed that despite the fact that Plaintiff testified that she experienced pain, there was no mention of diabetic neuropathy or pain management treatment in her medical records. A.R. 20. Moreover, the ALJ observed that Plaintiff had testified that her pain is "lessened" by her medication, and thus far she has only pursued conservative treatment for her pain, including physical therapy. A.R. 20

The ALJ noted that Plaintiff has not been hospitalized for her uncontrolled blood pressure, and has had no ophthalmologic, cardiac, renal or neurological involvement. A.R. 20. Additionally, the ALJ observed that she takes Lisinopril/hydrochlorothiazide, Norvasc, and metoprolol to treat these conditions. A.R. 20. The ALJ observed that Plaintiff also takes metformin for her blood sugar, and has no history of related medical complications, like heart attack, kidney failure, or stroke. A.R. 20.

The ALJ reviewed Dr. Merlin's report that Plaintiff had normal motor strength, gait and station, and had no difficulty getting from sitting to standing or getting on/off the exam table. A.R. 20. However, the ALJ found that in general, Dr. Merlin's opinion that Plaintiff is able to sit, stand, walk, crouch, carry, hear and speak, should be given reduced weight because it is "overly vague and does not address how often [Plaintiff] can perform these activities or how much weight she can lift and/or carry." A.R. 22. The ALJ also noted that based on her testimony, Plaintiff cannot stand for long periods, and cannot climb "a lot" of stairs or walk long distances – walking for a maximum of thirty minutes before having to rest. A.R. 21.

The ALJ further observed that Plaintiff is considered obese because she is 5' 4" and weighs approximately 184 pounds, giving her a Body Mass Index (BMI) of 31.6. A.R. 21. Taking into account Plaintiff's obesity, together with her other physical impairments, the ALJ found that Plaintiff was precluded from performing more than a limited range of light work. A.R. 21. The ALJ further observed that Plaintiff "underwent hysterectomy on October 24, 2011, with some resulting incontinence," but did not specifically discuss how this impairment might affect Plaintiff's RFC. A.R. 21.

In general, the ALJ found that Plaintiff was more limited than determined by the state medical agency consultants, and accordingly, gave their opinions little weight. A.R. 23. Where the state agency medical consultants determined that Plaintiff had non-severe physical impairments and moderate but not disabling mental limitations, based on Plaintiff's testimony, the ALJ found that Plaintiff suffered from more significant limitations. A.R. 23. The ALJ concluded that the state agency medical consultants had not adequately considered the combined effects of Plaintiff's impairments. A.R. 23.

16

Regarding Plaintiff's mental impairments, the ALJ noted that Plaintiff reported experiencing dysphoric moods; crying spells; fatigue; difficulty concentrating; excessive worry; nightmares; difficulty sleeping; flashbacks to unpleasant experiences; panic attacks with heart palpitations and sweating; short and long-term memory deficits; as well as the need to isolate herself from others. A.R. 20-21. The ALJ observed that Plaintiff underwent a polysomnogram in 2011, which revealed some mild snoring, for which weight loss was the recommended treatment. A.R. 21. Additionally, the ALJ observed that Plaintiff experiences episodes of increased agitation, characterized by arguments with others and thoughts of harming others. A.R. 20-21. The ALJ noted that Plaintiff needs reminders to take her medication. A.R. 21. The ALJ also referenced Plaintiff's fair appetite and history of marijuana and cocaine use. A.R. 21.

The ALJ reviewed Dr. Arrington's report, and found that some of her opinions regarding Plaintiff's mental impairments should be given "some weight," but gave little weight to Dr. Arrington's conclusion that Plaintiff had a GAF score of 50, *i.e.* that Plaintiff suffered from serious symptoms, like suicidal ideation, or that Plaintiff had serious difficulty in social, occupational, or school functioning. A.R. 22. Specifically, the ALJ determined that the following opinions of Dr. Arrington should be given some weight: that Plaintiff is able to follow and understand simple directions and instructions; is able to perform simple tasks independently; would have difficulty maintaining attention and concentration; would have difficulty learning new tasks and performing complex tasks independently; and would be able to maintain a regular schedule with support and structure. A.R. 22. The ALJ explained that these opinions merited some weight because they were "partially consistent with the other medical evidence and the other credible evidence in the record, including the findings on clinical examinations, the findings upon diagnostic studies and/or evaluations, and the claimant's symptoms." A.R. 22.

17

Conversely, the ALJ gave Plaintiff's GAF score little weight, because he found that it was "not consistent with the overall medical evidence of record, which appears to indicate moderate mental impairments." A.R. 22. Specifically, the ALJ concluded that Plaintiff's ability for social functioning would only slightly impact her ability to deal with the public, bosses, supervisors, or co-workers. A.R. 22. The ALJ explained that this conclusion was based on Plaintiff's display of good social functioning at the hearing. A.R. 22. For example, the ALJ observed that at the hearing, Plaintiff adequately responded to extensive questions, under stressful circumstances, in the presence of strangers, and appeared to relate adequately and comfortably with the ALJ and her counsel. A.R. 22. However, the ALJ accounted for discrepancies between his observations at the hearing, and Plaintiff's alleged limitations, by limiting Plaintiff's RFC to only occasional contact with others in the work setting. A.R. 22.

Additionally, the ALJ explained that Plaintiff's testimony regarding her ability to perform unskilled work on a regular sustained basis, supported his assessment that she has relatively good ability for maintaining concentration, persistence, attention and pace, at least to the extent necessary to perform sustained unskilled work tasks. A.R. 23. Specifically, the ALJ cited to Plaintiff's testimony that she maintains the ability to sew for long periods; that she reads "a lot"; that she performs "light sweeping" and "light dishwashing"; and that she can drive a car and shop. A.R. 23. Additionally, the ALJ relied on Plaintiff's report that "school" is part of her daily activities. A.R. 23. The ALJ concluded that "[t]his extensive array of activities require substantially good abilities for maintaining concentration, persistence, attention and pace, and are consistent with an ability to perform a limited range of unskilled, light work." A.R. 23.

Finally, the ALJ observed that Plaintiff receives no medication or other treatment for her alleged mental impairments, which supports a conclusion that her symptoms are not as disabling

18

as alleged. A.R. 23. However, the ALJ gave Plaintiff the benefit of the doubt, and accepted her allegations of dysphoric moods; some difficulty concentrating; and episodes of increased agitation causing impaired social interaction. A.R. 23. Accordingly, the ALJ determined that Plaintiff is limited to understanding, remembering and carrying out simple instructions; to having only occasional contact with others; and to working in an environment where changes are infrequent and gradually introduced, as she is likely to become more symptomatic with the added mental pressures generally associated with semiskilled and skilled work. A.R. 23.

Based on Plaintiff's RFC, the ALJ found that Plaintiff was capable of performing her past work as a mail clerk. A.R. 23. The ALJ observed that in the Dictionary of Occupational Titles, the work of a mail clerk is assigned a Specific Vocational Profile ("SVP") of 2, is unskilled, and has light exertional requirements. A.R. 23. The ALJ relied on the vocational expert's testimony that an individual given Plaintiff's age, education, work experience, and RFC could perform Plaintiff's past work as a mail clerk. A.R. 23. Therefore, because she was capable of performing her past work as a mail clerk, the ALJ's final determination was that Plaintiff was not disabled within the meaning of the Act from April 5, 2008 through the date of the ALJ's decision. A.R. 15, 23-24. Accordingly, the ALJ's analysis did not proceed to step five.

## II.    Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are considered conclusive by a reviewing court if supported by "substantial evidence in the record."

19

42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla" of evidence, but less than a preponderance of the evidence. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by substantial evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

## III.   Standard of Entitlement to Benefits

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C.

20

§ 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he is not currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," and mental functions such as "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." *Id.* A claimant who does not have a severe impairment is not considered disabled. 20 C.F.R. § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if an impairment is found to be severe, the ALJ then determines whether the claimant's impairments meet or are equal to any impairment on the Impairment List. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his burden of proof and is automatically entitled to benefits. *See* 20 C.F.R. § 404.1520(d); *see Bowen*, 482 U.S. at 146-47

21

n. 5. If the specific impairment is not listed, the ALJ will consider in his decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he retains the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform his previous work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to his past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n. 5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and is not disabled. *Id.*

## IV.   Plaintiff's Claims on Appeal

Plaintiff argues that the ALJ erred in his decision at step four by (1) failing to take into account all of her severe impairments in determining her RFC (2) failing to properly evaluate and

weigh the medical evidence of record in determining her RFC, and (3) failing to properly evaluate the vocational evidence on record. Plaintiff also submits that rather than remand this matter to the ALJ for a rehearing, the Court should reverse the ALJ's decision and grant summary judgment in her favor.

First, Plaintiff argues that the ALJ failed to take into account her incontinence when determining her RFC. Indeed, when discussing the bases for Plaintiff's RFC, the ALJ referenced her incontinence, but did not explain its effect on her RFC. A.R. 21. In that regard, when "making a residual functional capacity determination, the ALJ must consider all evidence before him." *Burnett v. Comm'r of SSA*, 220 F.3d 112, 121 (3d Cir. 2000). Social Security Ruling 96-8p requires that an adjudicator assessing an RFC "must consider limitations and restrictions imposed by all of an individual's impairments," both severe and non-severe. SSR 96-8p, 1996 SSR LEXIS 5. Additionally, the ALJ must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121. Stated differently, "the ALJ's finding of residual functional capacity must be accompanied by a clear and satisfactory explication of the basis on which it rests," otherwise the reviewing court "cannot tell if significant probative evidence was not credited or simply ignored." *Fargnoli v. Halte*r, 247 F.3d 34, 41-42 (3d Cir. 2001) (quoting *Cotter v. Harris*, 642 F.2d 700, 704-5 (3d Cir. 1981)) (quotations omitted).

At step two of his analysis, the ALJ found that Plaintiff's "incontinence from history of hysterectomy" is a severe impairment. A.R. 17. By definition, a severe impairment has at least a "minimal effect on an individual's ability to work." *McCrea*, 370 F.3d at 360. However, at step four, when formulating Plaintiff's RFC, the ALJ did not explain what effect this severe impairment had on Plaintiff's RFC. A.R. 21. Indeed, the ALJ's only reference to this impairment at step four was the purely factual observation that "[t]he claimant underwent hysterectomy [sic] on October

24, 2011, with some resulting incontinence." A.R. 21. Plaintiff testified that she experiences episodes of incontinence approximately three times per day, despite taking medication to treat this condition. A.R. 44-45. On one hand, the ALJ could reasonably have found that this impairment affected Plaintiff's RFC by forcing her to take frequent bathroom breaks during work hours. On the other hand, however, Plaintiff's incontinence might not affect her ability to work if it is sufficiently controlled with the use of supportive undergarments or other methods. Here, because the ALJ did not explain how this impairment factored into his analysis of Plaintiff's RFC, the Court cannot determine whether it was taken into account or simply ignored. *See Fargnoli*, 247 F.3d at 41. This failure to address relevant probative evidence is sufficient grounds for a remand. *See id.* at 42.

The Commissioner argues that Plaintiff has failed to meet her burden of proving that her incontinence results in a functional limitation that precludes her from her ability to perform her past work as a mail clerk. However, the ALJ's identification of Plaintiff's incontinence as a severe impairment at step two amounts to a finding that it has at least a minimal effect on her ability to work. *See McCrea*, 370 F.3d at 360. Therefore, pursuant to SSR 96-8p, the ALJ was required to consider Plaintiff's incontinence when determining her RFC. *See* SSR 96-8p, 1996 SSR LEXIS 5.

Alternatively, the Commissioner asserts that even if the ALJ erred in failing to explain the impact of Plaintiff's incontinence on her RFC, Plaintiff has not demonstrated that this error caused her harm. Under the harmless error rule, the party attacking an agency's determination has the burden of showing that the error prejudiced her "substantial rights." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). However, the ALJ's error in this case is not harmless, because had he considered Plaintiff's incontinence, the ALJ may have found that Plaintiff could not have performed her past work. Having considered Plaintiff's incontinence, the ALJ may have concluded that her condition

24

required her to take frequent breaks. To that point, the vocational expert testified that if Plaintiff's RFC also included a limitation requiring her to take a 10 minute break every hour, she would not be able to perform her past work, or any work available in the national economy. A.R. Based on the vocational expert's testimony, the ALJ may have found that a limitation of Plaintiff's ability to work without breaks could render her incapable of performing her past work as a clerk and any work available in the national economy. A.R. 62. Therefore, absent this error, the result of the ALJ's decision may very well have been different. *See Shinseki*, 556 U.S. at 411.

In sum, the ALJ's residual functional capacity determination does not provide this Court with a clear and satisfactory explication of its reasoning. Consequently, this case will be remanded for further proceedings on this point.

Second, Plaintiff contends that the ALJ improperly discounted portions of Dr. Arrington's report that were indicative of Plaintiff's disability, without explaining why this evidence was not credited. In making a disability determination, the ALJ may weigh the credibility of the evidence. *Burnett*, 220 F.3d at 121; *Cotter*, 642 F.2d at 705. However, the ALJ must give some indication of the evidence which he rejects and his reasons for discounting such evidence. *Burnett*, 220 F.3d at 121; *Cotter*, 642 F.2d at 705. An ALJ's failure to note if evidence that contradicts his findings was considered or to explain why such information was not credited, may be grounds for a remand. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 435 (3d Cir. 1999). However, in this Opinion, I need not rule on whether the ALJ erred in his analysis of Dr. Arrington's report, because I have already determined that a remand is necessary on other grounds. Regardless, on remand, the ALJ must fully explain his reasons for discrediting any medical evidence.

Third, Plaintiff argues that the ALJ failed to properly evaluate the vocational evidence on record. Specifically, Plaintiff contends that there is a conflict between the vocational expert's

testimony regarding Plaintiff's past work as a mail clerk, and the DOT's description of the functional requirements of a mail clerk position. According to Plaintiff, the ALJ erred by failing to identify and resolve the conflict between the vocational expert's testimony and the DOT's definition of "mail clerk."

In that connection, "Social Security Ruling 00-4p requires that the ALJ ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT, and that, if the testimony does appear to conflict with the DOT, to 'elicit a reasonable explanation for the apparent conflict.'" *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002) (quoting SSR 00-4p, 2000 SSR LEXIS 8). Thus, this Ruling requires both that the vocational expert's explanation of the conflict be made on the record and that the ALJ address in his decision how the conflict was resolved. *Id.* at 127. An ALJ's failure to explain a conflict between a vocational expert's testimony and the DOT can form the basis for a remand, where the record does not otherwise contain substantial evidence that the plaintiff can perform her past work or other jobs that exist in the economy. *See Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2003) (remanding case to Commissioner, where ALJ failed to address conflict between vocational expert evidence and the DOT and record did not contain evidence, other than the vocational expert's testimony, that the plaintiff could perform a significant number of jobs that exist in the economy); *see also Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005). However, because I am remanding this case on different grounds, I decline to rule in this Opinion as to whether the ALJ committed reversible error by failing to address a conflict in this manner. Nonetheless, on remand, in accordance with Ruling 00-4p, the ALJ should clarify and resolve any conflicts between the vocational expert's testimony and the DOT.

Plaintiff also submits that rather than remand this matter to the ALJ for a rehearing, the Court should reverse the ALJ's decision and grant summary judgment in favor of Plaintiff, because the Commissioner has "failed to meet his burden to rebut Plaintiff's prima facie showing of disability." Pl.'s Mem. of Law 14. In certain circumstances, it may be appropriate to reverse an ALJ's decision without remand, pursuant to 42 U.S.C. 405(g), if the administrative record has been fully developed and substantial evidence on the record as a whole indicates that a claimant is disabled and entitled to benefits. *Gilliland v. Heckler*, 786 F.2d 178, 184-85 (3d Cir. 1986). However, "[w]hen an ALJ does not address all of the evidence of record, the appropriate action is to remand for further proceedings, as a District Court has no fact-finding role in reviewing social security disability cases." *Zied v. Astrue*, 347 F. App'x 862, 865 (3d Cir. 2009). Here, remand is appropriate, because it will allow the ALJ to address the effect of Plaintiff's incontinence upon her RFC, as well as any outstanding questions regarding the credibility of Dr. Arrington's opinion and potential conflicts between the vocational expert's testimony and the DOT.

## V.    Conclusion

The Court finds that the ALJ did not provide a clear and satisfactory explanation for his determination of Plaintiff's residual functional capacity and thus, his decision is not based on substantial evidence. Accordingly, this case is remanded for further proceedings before the ALJ, consistent with this Opinion.


Dated: April 15, 2016


                                        /s/ Freda L. Wolfson
                                        Freda L. Wolfson
                                        U.S. District Judge

27